# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION | Case No. 3:19-md-2885 |
| This Document Relates to: *3M Co. v. Top Class Actions, LLC* Case No. 2:20-mc-74 | Judge M. Casey Rodgers Magistrate Judge Gary R. Jones |

## MDL PLAINTIFFS' RESPONSE TO MDL DEFENDANTS' MOTION TO COMPEL

## INTRODUCTION

Pursuant to this Court's Order granting the MDL Plaintiffs' Motion to Intervene, Dkt. 48, MDL Plaintiffs submit this Response to the MDL Defendants' ("3M") Motion to Compel. In doing so, the MDL Plaintiffs adopt and agree with the arguments set forth by Top Class Actions, LLC ("TCA") in its Response to 3M's Motion to Compel Discovery, Dkt. 17, and its Supplemental Briefing on Standing, Dkt. 23.

## BACKGROUND

As set forth by the parties in the Joint Pre-Hearing Brief, this "[t]his dispute centers around whether information submitted by potential claimants in the MDL through TCA's website is protected from disclosure based on attorney-client privilege and client confidentiality." Dkt. 17 at 5.   "The parties further dispute whether certain communications between TCA and its law firm clients are protected from disclosure under the work product doctrine." *Id*. "TCA asserts that it is an agent of its client law firms, and therefore, TCA has an obligation to keep the information submitted on the forms confidential. 3M disputes these arguments." *Id*.  Pursuant to court order in the District of Arizona, Dkt. 22, 3M and TCA briefed the issue of whether TCA has standing to assert the attorney-client privilege or the work-product protection.  *See* Dkt. 23, 29. Following the JPML's transfer of this action to MDL No. 2885, the issue of standing is now ripe for resolution.

The MDL Plaintiffs intervened to protect their privilege interest in the subpoenaed documents, to the extent this Court finds that TCA does not have standing to assert the privilege. Insofar as 3M's subpoena seeks documents and communications related to *all* current and potential claimants in MDL No. 2885 (rather than individual plaintiffs and their counsel), this matter is within Lead Counsel's sphere of responsibilities. *See* MDL Dkt. 76 at 3.

3M's subpoena seeks documents and communications relating to current and potential MDL No. 2885 plaintiffs, including *all* documents relating to (1) current and potential claimants who have asserted or may assert claims against defendants based on the use of the CAEv2; (2) any analysis done by TCA or any plaintiffs' law firm regarding claimants or their claims; (3) the referral of claimants to a lawyer; (4) marketing or advertising to current or potential claimants to join MDL No. 2885; (5) communications and agreements between plaintiffs' law firms and TCA; and (6) financial interest or ownership that any plaintiffs' law firm has in TCA. *See* Dkt. 1, Doc. 1-1, at 11-12.

3M concedes that its subpoena "arises out of" MDL No. 2885 and agrees that the subpoena seeks discovery relating to the claims for personal injuries sustained by MDL Plaintiffs from using the CAEv2. Dkt. 45 at 2. That 3M nevertheless chose to file the Motion to Compel in the District of Arizona—and then to fight to keep it there—instead of this consolidated 3M action is curious. Regardless, on December

2

15, 2020, the JPML, upon finding that "the subpoena action undoubtedly shares common factual questions with MDL No. 2885," transferred this matter to this Court for inclusion in MDL No. 2885. *Id*. at 2. This Court subsequently granted the MDL Plaintiffs' Motion to Intervene on January 6, 2021. Dkt. 48.

## LEGAL STANDARD

The Court has "broad discretion . . . to compel or deny discovery." *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1306 (11th Cir. 2011). Rule 26 limits discovery to "any nonprivileged matter that is relevant to any party's claims or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "On motion or on its own, the court must limit the frequency or extent of discovery" where "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii).

The attorney-client privilege is a creature of statute or common law, whereas the work-product privilege is codified in Rule 26(b)(3)(A). However, "[t]here is no typically no material distinction between the attorney-client privilege available under state law and federal common law."[1] *In re 3M Combat Arms Earplug Prods. Liab. Litig*., 2020 WL 1321522, at *3 n.3 (N.D. Fla. Mar. 20, 2020). Where, as here,

---

[1] Accordingly, MDL Plaintiffs cite both state and federal cases addressing attorney-client privilege. Given the transfer of this action from a federal court in the Ninth Circuit, Plaintiffs' Leadership Counsel provides additional citations addressing the issues at hand, including case law from courts within the Eleventh Circuit.

a party objects to the production of documents on the basis of attorney-client privilege or work-product protection, the objecting party bears the burden of demonstrating the privilege and/or protection. *In re Grand Jury Investigation*, 842 F.2d 1223, 125 (11th Cir. 1987). "The inquiry into whether documents are subject to a privilege is a highly fact-specific one." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000). The attorney-client privilege "is very nearly sacred." *Bessman v. Travelers Prop. Cas. Co. of Am.*, 2009 WL 10675305, at *1 (N.D. Fla. July 20, 2009). It is "the oldest of the privileges for confidential communications known to the common law" and "[i]ts purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981).

## ARGUMENT

3M's Motion to Compel and TCA's objections to production were fully briefed in the District of Arizona prior to the JPML's transfer of the matter to this Court. *See* Dkt. Nos. 39, 43. Plaintiffs' Leadership Counsel support and adopt TCA's arguments and the authority cited in response to 3M's Motion to Compel, including TCA's claims that "information submitted by potential claims in the MDL through TCA's website is protected from disclosure based on attorney-client privilege and client confidentiality." Dkt. 17 at 5. Plaintiffs' Leadership Counsel also support and

adopt TCA's briefing in the District of Arizona with respect to its standing to assert such privacy claims on behalf of its client law firms. *See* Dkt. 23.

To the extent the Court finds that TCA does not have standing to assert attorney-client privilege and client confidentiality claims, Plaintiffs' Leadership Counsel writes separately to respond to and specifically assert those privilege and work-product claims on behalf of current plaintiffs in MDL No. 2885 and other persons who pursued legal advice or assistance through TCA relative to their use of the CAEv2.[2] Insofar as any such person *sought legal advice or assistance of any kind* through TCA's website relating to their use of the CAEv2, those communications are protected from disclosure under the attorney-client privilege. Similarly, any communications between TCA and its law firm clients reflecting the lawyers' mental impressions or opinions regarding the proposed web page content before it was published on TCA's website, in addition to any analysis done by TCA or any law firm client regarding claimants or their claims, is protected work product.

## I.     It is well-recognized that the attorney-client privilege and work-product protection extend to an attorney's agent.

"[I]n order to promote complete exchanges of information and advice between attorney and client, the privilege has been extended to include those *persons who act*

---

[2] 3M subpoena broadly defines "Claimaint(s)" to include "all plaintiffs" in MDL No. 2885, "all persons who have contacted" TCA regarding "potential claims based on use of CAE[v2]," and "all other Persons that have asserted or may assert claims against Defendants based on use of CAE[v2]." Dkt. 1, Doc. 1-1 at 6.

*as the attorney's agents*, including 'secretaries, file clerks, telephone operators, messengers, clerks not yet admitted to the bar, and aides of other sorts.'" *E.E.O.C. v. DiMare Ruskin, Inc*., 2012 WL 12067868, at *7 (M.D. Fla. Feb. 15, 2012); *see Upjohn Co.*, 449 U.S. at 390 ("[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."). Hence, "the presence of a third party does not waive attorney-client privilege 'when the third party is present to assist the attorney in rendering legal services.'" *DiMare Ruskin,* 2012 WL 12067868, at *7; *see* Fla. Stat. § 90.502(c)(1)-(2) (privilege extends to agents and representatives of the attorney when disclosure furthers the rendition of legal services, or when disclosure is reasonably necessary for transmitting the communication).

Both state and federal courts recognize that "the existence of a formal retainer agreement is not essential to the finding of an attorney-client relationship." *Eggers v. Eggers*, 776 So.2d 1096, 1099 (Fla. 5th DCA 2001)*; see also Deslandes v. McDonald's USA, LLC,* 2019 WL 7480646 at *5 (N.D. Ill. July 17, 2019) (noting "the absence of a formal attorney-client relationship does not preclude the application of privilege"). Instead, the inquiry hinges on the client's subjective belief that he is seeking legal representation or specific legal advice from an attorney or the attorney's agent.

As noted in *Westinghouse Elec. Corp. v. Kerry–McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978), "[t]he fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result." *See also Mississippi Valley Title Ins. Co. v. Thompson*, 802 F.3d 1248, 1253-54 (11th Cir. 2015) ("The test for determining the existence of an attorney-client relationship is a subjective one and "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice."); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 2017 WL 6757558, at *7 (N.D. Fla. Dec. 29, 2019) ("[T]here is little question that where a client (or agent of the client) submits information to an attorney for legal advice the attorney-client privilege protects the communication from disclosure.").

As this Court has recognized in another MDL, the attorney-client protection "applies as well to information gathered by non-attorneys for transmission to an attorney for the attorney to provide legal advice on an issue or to provide legal advice regarding the document or information gathered by the non-attorney employee of the client." *In re Abilify*, 2017 WL 6757558, at *7. The Restatement and leading treatises on privilege are in accord. *See, e.g.*, Restatement (Third) of the Law Governing Lawyers § 70 (2000) ("Privileged persons within the meaning of § 68 are the client (including a *prospective client*), the client's lawyer, *agents of either*

7

*who facilitate communications between them, and the agents of the lawyer who facilitate the representation*.") (emphasis added); 8 J. Wigmore, EVIDENCE § 2301 at 538 (McNaughton Rev. Ed. 1961) ("The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents.").

In such cases, the third party "stands in the same shoes" as the client with regard to communications between the third party and counsel for the client so long as the communications "were made for the purpose of facilitating the rendition of legal services to the [] client." *In re Abilify*, 2017 WL 6757558, at *8. In sum, if the client or prospective client sought legal advice or assistance—through the attorney directly or through the non-lawyer agent who facilitates the representation—then the attorney-client privilege attaches to protect the communication. It does not matter whether or not a formal attorney-client relationship results.

Similar to the attorney-client privilege, the purpose of the work product protection "is to protect the integrity of the adversary process by allowing a lawyer to work 'with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'" *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)). Work-product protection "extends to material obtained or prepared

by counsel in the course of their legal duties provided that the work was done with an eye toward litigation." *Drummond*, 885 F.3d at 1334–35 (citing Fed. R. Civ. P. 26(b)(3)(A)). The work-product doctrine, nevertheless, "is distinct from and broader than the attorney-client privilege. *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975).

## II.    3M is not entitled to the subpoenaed documents because the information is privileged.

3M first argues that TCA wrongly withheld responsive documents on the basis of client confidentiality. Dkt. 1 at 5. 3M asserts that TCA is not a lawyer that owes a duty of confidentiality to its clients. *Id*. Instead, says 3M, "TCA's clients are law firms, not the potential claimants in the Combat Arms Earplugs litigation." *Id*. But as TCA has explained, 3M's claim misses the mark by ignoring the well-established attorney-agent exception. Contrary to 3M's claim, the attorney-client protection extends to a non-attorney agent who, as here, facilitates the provision of legal services to a client.

This Court has previously held that the attorney-client protection "applies as well to information gathered by non-attorneys for transmission to an attorney for the attorney to provide legal advice on an issue." *In re Abilify*, 2017 WL 6757558, at *7. In such cases, the non-attorney (*i.e.*, TCA) is said to "stand in the shoes" of the client with regard to communications between the third party and counsel. *Id*. So long as the person completing the form sought legal advice, the attorney-client exception

extends to cover TCA's participation in receiving and transmitting information between the prospective or existing client and the attorney. Indeed, TCA's "web pages are replete with information explaining that the form content will be sent to a lawyer, confidentially, so that the potential plaintiff's claim can be evaluated by a lawyer." Dkt. 10 at 2.

As such, the form responses and other communications between the client or potential client and attorney sought by 3M fall under the protection of the attorney-client privilege. The form responses are communications from clients or potential clients and were submitted for the purpose of seeking legal advice or assistance from counsel about the 3M litigation. The web pages clearly indicate the legal implications of submitting the form content. They were made in confidence and have been kept confidential by counsel. As summarized by TCA, "[t]he only [question] for the court is whether this privilege is lost because the form appears on topclassactions.com instead of the lawyer's own website." Dkt. 10 at 7. The privilege is not lost. In addition to the authority cited by TCA, including *Barton v. U.S. Dist. Court for Cent. Dist. of Cal.*, 410 F.3d 1104 (9th Cir. 2005) and *In re Int'l Oil Trading Co.*, 548 B.R. 825 (S.D. Fla. 2016), numerous other cases support a finding of privilege under similar circumstances.

*Hudson* held that questionnaires completed by existing clients or those "attempting to become prospective clients" are privileged.

*Corp.*, 186 F.R.D. 271, 276 (D. Conn. 1999). Because the "[p]laintiff sought legal guidance through the questionnaire, attorney-client privilege attaches to protect the communication." *Id.* The *Hudson* court noted that "[i]n actions involving representation of multiple clients like this one, a client questionnaire is often prepared by counsel as an efficient substitute for more time consuming face-to-face interviews to provide the attorney with client information in response to focused questions fashioned by the attorney about the potential client and his or her claims. . . . Such questionnaire use is necessary to impart information from client to counsel to promote informed, effective representation." *Id.* at 275; *see also Barton,* 410 F.3d at 1110–11 ("The changes in law and technology that allow lawyers to solicit clients on the internet and receive communications from thousands of potential clients cheaply and quickly do not change the applicable principles.").

Similarly, in *E.E.O.C. v. Scrub, Inc.*, 2010 WL 2136807 (N.D. Ill. May 25, 2010), the court held that completed questionnaires were protected from disclosure: "Where the questionnaires are completed by persons seeking legal representation, the privilege extends." *Id.* at *9. "The attorney-client privilege covers communications where 'legal advice of any kind is sought' and is not dependent upon the initiation or contemplation of litigation." *Id.* (quoting *Vodak v. City of Chicago*, 2004 WL 783051 (N.D. Ill. 2004)).

11

In *Vodak*, the magistrate judge held that the questionnaires completed by putative class members were not discoverable because they were completed for the purpose of obtaining legal advice and, therefore, protected by the attorney-client privilege. 2004 WL 783051, at \*1. Similar to the present case, in *Vodak* the questionnaire specifically stated that any information provided would be "held in strict confidence and used only by the attorneys providing legal representation." *Id*. The court further held that "an attorney-client relationship is also not tied to actual employment of a lawyer, so Scrub's argument that the questionnaires are not privileged because EEOC did not make a definitive offer to represent potential claimants is unavailing." *Id*. (holding that the lawyer client relationship begins with the preliminary consultation "with a view to retention of the lawyer, although actual employment does not result").

And finally, in *Deslandes v. McDonald's USA, LLC*, 2019 WL 7480646, at \*5 (N.D. Ill. July 17, 2019), which is particularly analogous to the case at hand, the plaintiff sought legal guidance through a questionnaire advertisement by a law firm (MVA) on Facebook regarding McDonald's wages, and completed a questionnaire linked to the advertisement. *Id*. at \*4. The questionnaire responses were received by attorneys and support staff at MVA as well as Ms. Ochi, Director of Digital Marketing for ONE400, a law firm marketing agency—much like TCA. *Id*. Similar to the present case, the law firm MVA contracted with the marketing company

12

ONE400 "to perform website management and content distribution." *Id*. ONE400 "converted [plaintiff's two] intake form submissions into emails that were then sent to several MVA attorneys and staff members, along with Ms. Ochi." *Id*. According to plaintiff, Ms. Ochi was included on the emails "to ensure that potential client leads originating from the MWA website were appropriately accounted for and addressed." *Id*. Plaintiff asserted that ONE400's services were necessary "for the rendering of legal advice" and noted that ONE400 "was subject to a strict confidentiality requirement for all 'Client Information' . . . equivalent to those applicable to any other in-house non-attorney personnel at MVA." *Id*.

Defendant filed a motion to compel the plaintiff's questionnaires, claiming they were not privileged. It argued that the questionnaire responses merely amounted to "generalized requests for contact" used to determine the viability of [p]laintiff's claim." *Id*. at *5. Defendants also pointed to a footer on MVA's website that stated it "is not intended to create . . . an attorney-client relationship." *Id*. In response, plaintiff "assert[ed] that she completed the online questionnaire to seek legal advice, and thus the attorney-client privilege presumptively applies." *Id*.

Upon consideration, the court held that the questionnaires were indeed covered by the attorney-agent exception. As noted by the court, "[t]he attorney-agent exception applies where a third party is 'present to assist the attorney in rendering legal services.'" *Id*. The court found that because "[p]laintiff sought legal guidance

13

through the questionnaire, [the] attorney-client privilege attaches to protect the communication." *Id*. Indeed, the plaintiff confirmed that "she knew her submissions would be provided to a lawyer and that she completed the questionnaire to get legal advice about her rights as a former McDonald's employee." *Id*. Thus, the court held, "the attorney-client exception extends to cover One400/Ms. Ochi's participation in the submission." *Id*.

In doing so, the court rejected the defendant's claim that Ms. Ochi merely served a "contractual technical support function." *Id*. As noted by the court, "there is little difference between [Ms. Ochi's] role in this instance and that of an in-house IT employee tasked with operating a law firm's website. As Ms. Ochi was 'responsible for transmitting messages between the attorney and client,' her involvement falls within the spirit of the attorney-agent exception. Thus, the attorney-client privilege protects the questionnaire responses from disclosure." *Id*.; *see also In re Abilify*, 2017 WL 6757558, at *7 (the attorney-client privilege "applies as well to information gathered by non-attorneys for transmission to an attorney for the attorney to provide legal advice on an issue or to provide legal advice regarding the document or information gathered by the non-attorney employee of the client").

In sum, the following categories of documents sought by 3M are protected by the attorney-client privilege: (1) current and potential claimants who have asserted or may assert claims against defendants based on the use of the CAEv2; and (2) the

14

referral of claimants to a lawyer. Because the attorney-client privilege applies to information gathered by non-attorney agents such as TCA, who were retained to facilitate and assist the attorneys in rendering legal advice for existing and prospective clients related to the 3M litigation, the attorney-client privilege attaches to protect this information and 3M's Motion to Compel should be denied.

## III.   The documents sought by 3M are also not discoverable because they are protected under the work-product doctrine.

Because the documents sought by 3M's subpoena are privileged, the Court does not need to reach the question of whether the work-product doctrine offers an additional source of protection. *See e.g., United States v. Gumbaytay*, 276 F.R.D. 671, 680 n.11 (M.D. Ala. Jan. 19, 2011). It nonetheless provides another independent basis for denying 3M's Motion to Compel. *See United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975) (stating the work-product doctrine "is distinct from and broader than the attorney-client privilege").

3M argues that TCA was hired solely to generate leads, not to "provide consultation regarding preparation of any claims for trial." Dkt. 1 at 9. However, 3M incorrectly portrays TCA's involvement. As explicitly noted in TCA's opposition to the subpoena, "a lawyer is responsible for the content of attorney advertising; as such, law firms review the proposed web page content before it is published on TCA's web site." Dkt. 1 at 13. "TCA's writers can draft the content, but the lawyers

are masters of the claim and strategy. The lawyers' comments on the marketing reflects their opinions of the claim and strategy." *Id.*

Courts within the Eleventh Circuit have considered whether plaintiff waived work-product protection by sharing information with agents or other representatives. Those courts have held that that the work-product doctrine exists to protect an attorney's work from discovery by an opponent. The work-product privilege exists "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent.'" *In re Trasylol Prods. Liab. Litig.*, 2009 WL 2575659, at *6 (S.D. Fla. Aug. 12, 2009)). Because the doctrine protects the adversary system, "it is not automatically waived by the disclosure to a third party." *In re Grand Jury Subpoena,* 220 F.3d 406, 409 (5th Cir. 2000).

Rather, "[w]ork-product protection is waived when protected materials are disclosed in a way that 'substantially increases the opportunity for potential adversaries to obtain the information.'" *Brown v. NCL (Bahamas) Ltd.*, 155 F.Supp.3d 1335, 1339 (S.D. Fla. 2015). "Disclosure to [a] person with interest common to that of attorney or client [as between TCA and its advertising law firm] is not inconsistent with [the] intent to invoke [the] work product doctrine's protection and would not amount to waiver." *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981).

16

Here, TCA shares a common interest with the law firms who hired TCA, in that the law firms and TCA shared information for the limited purpose of marketing information about the CAEv2 litigation to potential clients. *See California Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 299 F.R.D. 638, 646 (E.D. Cal. 2014) ("In the work product context, common interests are not construed so narrowly as to limit the exception only to co-parties. The shared interest may be only financial or commercial in nature."). As TCA aptly put it, "TCA exchanged communications with the law firms, in confidence, to effectuate a shared purpose: to help the law firm and clients find each other. These communications did not increase the possibility of 3M's obtaining the communications." Dkt. 10 at 15. Because email communications between TCA and the advertising law firm did not "substantially increase" the possibility of 3M's obtaining the communications and is not inconsistent with the intent to invoke work-product doctrine's protection, the work-product protection has not been waived.

TCA has already produced select redacted communications between TCA and the law firms relating to the attorney advertising. Dkt. 10 at 13. TCA appropriately produced those emails that did not reflect the attorney's mental impressions or opinions of the content. *Id*. The remaining category of documents are protected by the work-product doctrine to the extent they contain the mental impression and opinion of the plaintiffs' lawyers about the 3M case, namely documents relating to

(1) any analysis done by TCA or any plaintiffs' law firm regarding claimants or their claims; (2) marketing or advertising to current or potential claimants to join MDL No. 2885; and (3) communications and agreements between Plaintiffs' law firms and TCA.

**IV.  The remaining documents sought by 3M are not discoverable because they are not relevant to the claims or defenses in this litigation.**

Finally, 3M's subpoena seeks documents relating to any financial interest or ownership that any person, including Plaintiffs' law firms, has in TCA. Dkt. 1, Doc. 1-1 at 12. Privilege and work-product concerns aside, this request is problematic because that it seeks information that is not relevant to the claims or defenses to the underlying litigation, is facially overbroad, and does not have any time parameters. A facially overbroad subpoena is unduly burdensome. *Ubiquiti Networks, Inc., v. Kozumi USA Corp*., 295 F.R.D. 517, 527 (N.D. Fla. 2013) ("A court may find that a subpoena presents an undue burden when the subpoena is facially overbroad."). Plaintiffs' Leadership Counsel thus relies and adopts the arguments and authority set forth in TCA's response to 3M's Motion to Compel with respect to 3M's request documents relating to the financial interest or ownership of TCA.

## CONCLUSION

Based on the foregoing, Plaintiffs' Leadership Counsel requests that this Court deny 3M's Motion to Compel.

18

DATED: January 20, 2021

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, Lead Counsel
Florida State Bar No. 078263
Aylstock, Witkin, Kreis & Overholtz,
PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel.: (850) 202-1010
baylstock@awkolaw.com

Shelley V. Hutson, Co-Lead Counsel
(Admitted Pro Hac Vice)
Texas State Bar No. 00788878
Clark, Love & Hutson, GP
440 Louisiana Street, Suite 1600
Houston, TX 77002
Tel.: (713) 757-1400
shutson@triallawfirm.com

Christopher A. Seeger, Co-Lead
Counsel
(Admitted Pro Hac Vice)
New Jersey State Bar No. 042631990
Seeger Weiss LLP
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
Tel.: (212) 584-0700
cseeger@seegerweiss.com

**Counsel for MDL Plaintiffs**

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH LOCAL RULES 7.1(F) AND 56.1(E)</u>

I hereby certify that this motion complies with the word limit of Local Rules

7.1(F) and 56.1(E) and contains 4325 words.

*s/ Bryan F. Aylstock*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 20, 2021, I caused a copy of the foregoing to be filed through the Court's CM/ECF system, which will serve all counsel of record.

*s/ Bryan F. Aylstock*